Bernard ARMSTRONG, Appellant,

v.

CORN BELT BANK, Appellee.

No. 85–3351.

United States District Court, C.D. Illinois, Springfield Division.

Dec. 11, 1985.

Jack C. Vieley, Peoria, Ill. for debtor.

Pratt, Sternberg & Finegan, Bloomington, Ill., for the Corn Belt Bank.

## ORDER

MILLS, District Judge:

Is the Appellant a "farmer"?

No—not for bankruptcy purposes.

Therefore, he *can* be placed in involuntary bankruptcy under Chapter 7.

This appeal from a bankruptcy court decision presents the issue of whether the appellant, Bernard Armstrong, is a "farmer" under the Bankruptcy Code (Code) and, if not, whether he can be adjudicated a debtor under Chapter 7 of the Code and placed in involuntary bankruptcy.

On March 31, 1982, the Corn Belt Bank (the bank) filed a petition seeking to place Mr. Armstrong in involuntary bankruptcy pursuant to section 303(a) of the Code, 11 U.S.C. § 303(a). In compliance with section 303, the bank alleged that Armstrong owed it more than $5,000, that Armstrong was not paying his debts as they became due, and that there were fewer than twelve non-contingent claims against Armstrong. *See* 11 U.S.C. § 303(b)(2).

The bankruptcy court issued two separate orders in this case: the first finding Mr. Armstrong a non-farmer, thereby qualifying him for involuntary bankruptcy provisions, and the second (issued some 2 years later) finding him a Chapter 7 debtor subject to involuntary bankruptcy. The bank's initial contention is that this Court lacks jurisdiction to review the bankruptcy judge's first order finding Mr. Armstrong a non-farmer.

On December 1, 1982, the bankruptcy court ruled on the bank's petition and ordered that Mr. Armstrong be placed in Chapter 7 bankruptcy. In so holding, the court decided that Mr. Armstrong was not a "farmer" during fiscal 1981, and therefore that section 303(a) does not preclude an involuntary case against him. Believing that this was the sole issue to be decided in ruling on the bank's petition, the court then granted the petition, placing Mr. Armstrong in bankruptcy.

However, on January 14, 1983, the parties filed a stipulation to *partially* vacate the December 1, 1982, order. They agreed that the issue of whether Armstrong was a "debtor" was still pending and had to be ruled upon before the petition could be granted. Pursuant to this stipulation, the December 1 order was "amended and vacated regarding the issue, finding, or adjudication of Bernard Armstrong as a Debtor ..." That portion of the order holding Armstrong a non-farmer, however, remained standing as part of the original order. Mr. Armstrong did not file an appeal of either the December 1 or the January 14 order.

Thereafter, on May 31, 1985, the bankruptcy court issued another opinion and order, holding specifically that Mr. Armstrong was a debtor under Chapter 7 of the Code and granting the bank's petition. Appellant filed a timely notice of appeal from this order. The bank now contends that because Armstrong did not immediately appeal the December 1 order (as modified on January 14), this Court is without subject matter jurisdiction to review the decision holding Mr. Armstrong a "non-farmer" under the Code. Armstrong maintains, on the other hand, that the December 1 order was not "final" and therefore the issue decided in that order was not appealable until the May 31, 1985, order granting the petition and affording the relief requested.

## I

This Circuit has recently explained that under both the current provision governing bankruptcy appeals (28

U.S.C. § 158, adopted July 10, 1984) and the immediate predecessor to that provision (28 U.S.C. § 1293), only *final* orders by the bankruptcy courts are appealable to the district courts. *See Matter of Fox,* 762 F.2d 54, 55 (7th Cir.1985); *Matter of Riggsby,* 745 F.2d 1153, 1155 (7th Cir.1984). It seems reasonably clear in this case that the bankruptcy court's December 1 order was not final. This is true even in the bankruptcy context where the finality standard is more liberal than the standard generally applied in non-bankruptcy proceedings. *See In re Saco Development Corp.,* 711 F.2d 441, 444–46 (1st Cir.1983). Despite the more liberal finality standard, bankruptcy cases interpreting finality under 28 U.S.C. § 1293 establish the general rule that an order determining the rights and liabilities of the parties and remanding solely for an accounting is still interlocutory. *In re Goldblatt Bros., Inc.,* 758 F.2d 1248 (7th Cir.1985) (citing *Liberty Mutual Insurance Co. v. Wetzel,* 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976) ("Partial summary judgments limited to the issue of petitioner's liability ... are by their terms interlocutory, see Fed.R.Civ.P. 56(c), and where assessments of damages ... remains to be resolved, have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291.") An exception to this rule exists where the accounting is merely mechanical or ministerial. *Shearson Loeb Rhodes, Inc. v. Much,* 754 F.2d 773, 776–77 (7th Cir.1985).

■ In the case at bar, the order issued December 1 and partially vacated January 14 clearly did not conclusively determine the liability issue, much less reach the accounting stage. Rather, it decided a preliminary issue—whether Mr. Armstrong met the Code's definition of a farmer—that had been raised by the parties but which was not determinative of the case's outcome. Still remaining was the issue of whether Mr. Armstrong was a Chapter 7 "debtor" in that he was not generally paying his debts as they became due. Therefore, the order was interlocutory in nature. As such, Armstrong could not have immediately appealed the order without leave of

court pursuant to 28 U.S.C. § 158(a). Under these circumstances, he did not waive his right to have the issue considered upon a timely appeal of the bankruptcy court's final judgment. Since Armstrong filed a timely appeal of the court's final judgment entered May 31, 1985, this Court has jurisdiction to review the matter decided in the December 1 order. The Court will now turn to the merits of this appeal.

## II

■ Appellant Armstrong raises essentially two grounds for reversal of the bankruptcy court's decision: (1) that the court erred in finding him a "non-farmer" under section 303(a) of the Code; and (2) that the court erred in holding that Mr. Armstrong was not meeting his debts as they became due. In reviewing the bankruptcy court's decision, the court's conclusions of law are freely reviewable on appeal. *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); *Matter of Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980). If this Court concludes that Mr. Armstrong was not a farmer under the Code, then it must be determined whether the bankruptcy court's finding that the debtor was not generally paying his debts as they became due was clearly erroneous. *Multiponics,* 622 F.2d at 709. The burden of showing that the bankruptcy court's findings are clearly erroneous is on the party seeking to reverse those findings; merely showing that the court could have reached another conclusion on the evidence presented is not sufficient. *In re Huntington, Ltd.,* 654 F.2d 578, 583 (9th Cir.1981).

The first issue is whether Armstrong met the Code's definition of a farmer in 1981, the year prior to the taxable year the petition was filed. Under section 303(a) of the Bankruptcy Code, involuntary cases are not permitted against a farmer:

> An involuntary case may be commenced only under Chapter 7 or 11 of this title, and only against a person, except a farmer or a corporation that is not a moneyed,

business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.

11 U.S.C. § 303(a).

The reason farmers are immune from involuntary petitions is explained in part by the legislative history of the statute, which states that farmers should be:

> ... excepted because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors should not subject him to involuntary bankruptcy.
>
> House Rep. No. 95–595, p. 322, U.S.Code Cong. & Admin.News 1978, p. 6278.

A "farmer" is defined by section 101(17) as a:

> ... person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a *farming operation* owned or operated by such person.
>
> 11 U.S.C. § 101(17).

And section 101(18) defines a *farming operation* to include:

> ... farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.
>
> 11 U.S.C. § 101(18).

As these definitions make clear, whether Mr. Armstrong was a "farmer" in 1981 depends upon whether he received more than 80% of his gross income from farming operations during that year. This, in turn, depends upon what portions of his 1981 income should be considered "income from farming operations" or "farm income."

Mr. Armstrong's taxable year (a calendar year) immediately preceding the taxable year of the petition was 1981. During that year his gross income was composed of the following items:

| | |
|---|---|
| Sale of Beans | $33,175.00 |
| Sale of Corn | 4,932.00 |
| Sale of Machinery | 29,500.00 |
| Elevator Patronage Dividend | 72.00 |
| Farming Rent | 17,181.50 |
| Gasoline Tax Credit | 61.00 |
| Gasoline Tax Refund | 92.50 |
| Interest from Farm Account | 1,701.00 |
| Wages from Armstrong Seed Co. | 12,000.00 |
| Non-farm interest | 350.00 |
| Non-farm interest | 28.00 |
| | $99,093.00 |

The bankruptcy court held that three of these items could not be considered "farm income": (1) the sale of farm machinery; (2) the farm rent; and (3) interest from the farm account. All other items were included as part of Mr. Armstrong's "farm income." Excluding the above three items from farm income, Mr. Armstrong's farm income totaled $38,332.50 and represents only 38.68% of his total gross income for 1981. Because this is far less than the 80% required by § 101(17), the bankruptcy court ruled that Mr. Armstrong was not a farmer during 1981, and was therefore subject to an involuntary bankruptcy case.

The parties presently dispute only whether the sale of farm machinery and the farm rent should have been included as farm income. Considering first the sale of farm machinery, appellant contends that farmers regularly buy and sell machinery and that this amount should be considered part of a farm's normal income. Appellant cites *Jenkins v. Petitioning Creditor— Ray E. Friedman*, 664 F.2d 184 (8th Cir. 1981) in support of his position that income must be earned from something more than a source collateral to farming operations for it to be not included in the debtor's farm income.

In *Jenkins*, an involuntary petition was brought against Mr. Jenkins who was both a farmer and a commodities broker. During the year previous to the petition, Mr. Jenkins earned gross income of approximately $60,000 from his farming operations, but did not realize any income from his commodities trading. In addition, Jenkins received $2,820 from the sale of hail insurance, a business he maintained in addition to farming. The Court held that because well over 30% of his income was derived from farming, the requirements of

section 101(17) were satisfied. In so holding, the Court stated that "although Jenkins' commodities trading occurred on a regular basis and resulted in substantial losses, Friedman has not established that his trading activities were more than a collateral venture ..." 664 F.2d at 187.

The facts of *Jenkins* cannot control the present case because unlike the situation before this Court, there was no dispute in *Jenkins* that well over 80% of Mr. Jenkins' income was derived from farming. Thus, the Court's statement in *Jenkins*—that it was not established that Mr. Jenkins' trading activities were more than a collateral venture—was merely another way of stating that Mr. Jenkins' other ventures did not amount to over 20% of his gross income for the year. By contrast, the bankruptcy court's decision in this case held that the income from the sale of farm machinery was no more "than a sale of a portion of the equipment of a person in financial trouble." This view is supported by Mr. Armstrong's own statements that the sales were occasioned by a partial closing of his farming operation. Thus, the court felt that these sales were clearly more than a "collateral venture" and that the income from the sales did not constitute income from farming operations. Therefore, the case at bar is factually distinguishable from *Jenkins* and its result should not control this case. And as the bankruptcy court's decision is consistent with the law set forth in *Jenkins*, appellant's argument is without merit.

In holding that the farm equipment sales were not part of Mr. Armstrong's "farm income", the bankruptcy court also held that it would take the matter a step too far to say that the income was derived from tilling the soil or farm production. Rather, the court felt that a sharp distinction should be drawn between income from tillage or production itself, and income from equipment which tills and produces.

Such a distinction is valid in light of the legislative policy behind exempting farmers from involuntary cases. As previously noted, the overriding purpose of the exception is to protect those whose major source of income is dependent upon sales of ordinary farm products, such products being subject to the ravages of climate and fluctuating farm prices. *See In re Hines*, 7 B.R. 415, 418 (Bkrtcy.D.S.D.1980). Therefore, those who receive a substantial portion of their income (more than 20%) from transactions such as equipment sales, which are not subject to those dangers, should not fall within the definitions of section 101(17) and (18). The exception was intended to protect a limited group of people and should not be extended to those who do not fall within the clearly defined limits of that exception.

In view of the express definitions of section 101(17) and (18) and the purpose for the farming exception, the distinction drawn by the Court below was warranted, and the Court was correct in not including the income from equipment sales in farm income.

### III

As noted by the bankruptcy court, the exclusion of the $29,000 from the equipment sales alone excludes Armstrong from the Code's definition of a farmer. Nonetheless, the court proceeded to determine whether the farming rent should be included in farm income. The court held that it should not, and this finding will now be reviewed.

Citing *In re Blanton Smith Corp.*, 7 B.R. 410 (M.D.Tenn.1980), the bankruptcy court noted that Mr. Armstrong did not share any of the risks of farming with his tenant. Instead, he received his rent "up front", regardless of how well the farming operations were doing. For this reason, Mr. Armstrong's rent income had no connection to the dangers inherent in normal farm income, and the court held that it could not be included as "income from a farming operation" for the purposes of section 101(18). Appellant argues that the bankruptcy court erred in adding the risk element to the *Blanton Smith* case.

*Blanton Smith* held that a debtor cannot be denied the status of a "farmer" merely

because it owns rather than operates a farming operation. 7 B.R. at 412. In its analysis, the Court carefully traced the legislative history of section 101(17) in order to show that Congress intended to expand the definition of "farmer" to include a farming corporation or agribusiness. In doing so, the Court noted that:

> ... the definition of "farmer" under H.R. 8200 in terms of income derived from a farming operation "owned or operated" by such a person represented a departure from the law under the prior Act, which required that an individual seeking characterization as a farmer be *personally* engaged in farming or tillage of the soil. It was well settled under the old Act that one who owned a farm and leased it to a tenant was not a "farmer" within the meaning of the term when the owner did not personally participate in the cultivation or operation of the farm but merely received the rent therefrom. 1 Collier, Bankruptcy § 4.15[2.1] (14th ed. 1974); *see Beamesderfer v. First Nat'l Bank & Trust Co.*, 91 F.2d 491 (3d Cir.), *cert. denied*, 302 U.S. 686, 58 S.Ct. 35, 82 L.Ed. 530 (1937); *First Nat'l Bank & Trust v. Beach*, 86 F.2d 88 (2d Cir.1936), *aff'd*, 301 U.S. 435, 57 S.Ct. 801, 81 L.Ed. 1206 (1937).

7 B.R. at 414.

In contrast with the old act, the current Act defines a farmer as a person who receives more than 80% of his income from a farming operation *"owned or operated* by such person." 11 U.S.C. § 101(17).

■ In this case, however, the bankruptcy court held that "mere ownership without risk is not enough." The Court reasoned that although the debtor in *Blanton Smith* was a large agribusiness that owned hens located on farms where they were raised by others, the debtor shared the risk of farming by being the marketing end of the poultry production. By contrast, Mr. Armstrong received his rent up front and without taking part in the risk inherent in farming.

No case law directly on this point has been cited to us, nor are we aware of any. This Court believes, however, that the bankruptcy judge was not in error in drawing this distinction and in requiring that some connection with the risks inherent in farming be shown. The legislative history, while giving the term "farmer" a broad scope, also indicates an intent to protect only those whose income is derived from operations that are subject to climate, farm price fluctuation, and uncertain crop production. As stated in *In re Hines:*

> Certainly, Congress knew that farming is a speculative business. A farmer's annual income can vary substantially due to the farmer's dependence upon the weather, crop production, prices, etc. Due to the nature of his business, a farmer cannot readily ascertain, with any degree of certainty, what his future income for the coming years will be.

7 B.R. at 418.

Clearly, rent income that is received "up front" and which is not subject to any of the natural risks of farming has no connection with this rationale. The Armstrong lease simply did not subject the landlord to any of the risks of operating a farm, risks that Congress specifically sought to guard against. It is clear that under the new act a person need not personally till the soil to be a farmer; his income, however, must have some connection with the inherently speculative nature of farm income. As Mr. Armstrong's rental income did not, it was proper for the bankruptcy court to hold that the rental income is not "farm income." Accordingly, the bankruptcy court's findings that the sale of farm equipment and the rental income are not "income from a farming operation" pursuant to section 101(17) is AFFIRMED. Therefore, Mr. Armstrong is not exempt from an involuntary case under section 303(a) of the Bankruptcy Code.

### IV

The final issue is whether the bankruptcy court's finding that Mr. Armstrong was not generally paying his debts as they became due was clearly erroneous. Section 303(h)(i) of the Act provides that:

762

The Court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts that are the subject of a bona fide dispute ... 11 U.S.C. § 303(h)(i)(1985 Supp.)

In determining whether a debtor is generally paying his debts as they become due, the Seventh Circuit in *Matter of Covey*, 650 F.2d 877, 883 n. 8 (7th Cir.1981) held that the approach taken by the Texas bankruptcy court in *In re All Media Properties, Inc.*, 5 B.R. 126 (Bkrtcy.S.D.Tex.1980) is appropriate. In *All Media*, the Court stated that:

... generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will be significant will be fewer than where the debtor has a large number of debtors. Also, the amount of the debts not being paid is important. If the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper.

5 B.R. at 143. *See also In re Salem Corp.*, 29 B.R. 424, 432 (Bkrtcy.S.D.Ohio 1983).

In the present case, the bankruptcy court found that Mr. Armstrong owed the bank over $493,000 as of the date the petition was filed. This debt is undisputed by the parties and is evidenced by notes signed by Mr. Armstrong individually. In addition, the court found that Mr. Armstrong personally guaranteed $450,000 of a $454,000 loan to the Hybrid Seed Company. In finding that these debts were not being paid as they became due, the court noted that Armstrong had just over 100 acres in his own name and was not current on the payments on the notes. Further, Mr. Armstrong himself stated that he could not have repaid a debt that was close to one million dollars. This Court cannot disturb those findings because the record supports the findings and they are not clearly erroneous.

■ Appellant argues, however, that the bank's claims against him for the loan guaranteed by Armstrong are contingent as to liability. Section 303(b)(1) gives the right to be a petitioning creditor to any holder of a claim except the holder of a claim contingent as to liability. *Matter of Covey, supra*, 650 F.2d at 881. Claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor. *In re All Media, supra*, 5 B.R. 126. Appellant argues that the bank's claim involving the loan to Hybrid Seed Company, which Armstrong guaranteed, is contingent as to liability because it was never shown that Hybrid Seed Company had in fact defaulted on the loan.

■ Appellant's argument is without merit for two reasons: First, even if the guaranteed debt could be termed contingent as to liability, Armstrong still owes a clear non-contingent debt of almost a half-million dollars. This debt alone would easily justify the bankruptcy court's decision. Second, Armstrong unconditionally guaranteed to pay those notes by signing them individually. Under Illinois law, such a guarantee is regarded as an absolute undertaking to pay the note when the principal defaults. *See* Illinois Law & Practice, Vol. 20, Guaranty, § 44, at 541. In its findings of fact, the bankruptcy court found that Armstrong was not current in payment on all the notes, including those involving the guarantee. And the Court noted that Mr. Armstrong offered no evidence to the contrary. As this factual finding is not clearly erroneous, it cannot be disturbed on review.

In accordance with the above, the decision of the bankruptcy court is AFFIRMED.