**In re Edwin J. GUINNANE Katherine J. Guinnane, Debtors.**

**Bankruptcy No. 86–20516.**

United States Bankruptcy Court, D. Montana.

May 5, 1987.

1. This case was originally filed under Chapter 11 on September 10, 1986, and converted to Chapter 12 on February 12, 1987, approving Debtors' motion to convert filed January 10, 1987. Upon conversion, the applicable provisions of the Family Farmer Act became applicable. The Act clearly states that gross income is

Joseph W. Duffy, Great Falls, Mont., for debtors.

Malcolm Goodrich, Billings, Mont., for Interstate Production Credit.

**ORDER**

JOHN L. PETERSON, Bankruptcy Judge.

At Butte in said District this 5th day of May, 1987.

In this Chapter 12 case, Interstate Production Credit Association (PCA) has filed a motion to dismiss this proceeding on the grounds the Debtors do not qualify as family farmers under Chapter 12. The Debtors resist the motion and hearing was held on April 2, 1987.

PCA claims that figures obtained for the Debtors' gross farm and non-farm income for 1986[1] show farm figures are taken from the operation of the Debtors, and at the hearing on the motion to dismiss the Debtor Katherine Guinnane stated she had made an error in her deposition which she

to be earned "for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed; * * *". The filing date of this Chapter 12 proceeding is January 10, 1987. The tax year preceding 1987 is 1986. Thus all income figures must be used from 1986 gross income figures.

corrected upon signing the deposition after its transcription. Once the correction is made, the Debtors' farm income shows gross receipts of $134,909.00 and non-farm income of $122,872.00. The Debtors' farm income is derived from sale of cattle, trucking cattle and custom haying. PCA challenges the use of the figures by the Debtors. Specifically, PCA claims that the figure of $13,887.00 included by the Debtors as farm income is, in reality, non-farm income derived from trucking of cattle raised by third parties. In support of such position, PCA has shown that a like income item for 1985 in the sum of $15,856.00 was treated in the income tax returns of the Debtors as being derived from a trucking business, and was not included as farm income. If the sum of $13,887.00 is non-farm income, by the Debtors' own figures, they do not meet the 50% income test under 101(17).

Under 11 U.S.C. § 101(17), it is provided that family farmer means a person engaged in a farming operation whose aggregate debts do not exceed $1,500,000.00 with not less than 80% of whose aggregate non-contingent debts arise out of the farming operation, and such individual and spouse receive more than 50% of the individual gross income from the preceding taxable year from such farming operation. Under 11 U.S.C. § 101(20), farming operation includes farming, tilling of the soil, dairy farming, ranching, production or raising of crops, poultry or livestock, and production of poultry or livestock products in an unmanufactured state. In *Collier on Bankruptcy*, Sec. 101.19, P. 101–42.4 (15th Cir.), the treatise states:

> "Although certain modes of farming are specified, the definition of 'farming operation' is not limited to those operations specifically enumerated. Section 101(18)[20] specify 'ranching' and 'raising of crops' as farming operations. The older phrase 'tilling of the soil' has been retained."

Section 101(20), formerly 101(18), was discussed at length in the case of *In re Dakota Lay'd Eggs*, 57 B.R. 648, 653 (Bankr.N. D.1986), where the court states after discussing *In re Blanton Smith Corp.*, 7 B.R. 410 (Bankr.M.D.Tenn.1980):

> " * * * Tracking the legislative history of 101(17) and (18)[20], as well as the definition of 'person' found in Section 101(33), the Bankruptcy Court in *Blanton Smith* concluded that the term 'farmer' could no longer be confined to small farms but rather must include in its definition farming corporations and agri business. With that conclusion, this Bankruptcy Court agrees. The *Blanton Smith* case, however, did not address the issue from the standpoint of income or production sources. It did not attempt to distinguish between debtor-owned or operated farming operations and non-owned or non-operated farming operations. * * *

> \* \* \* \* \* \*

> In construing Section 101(18)[20], several things must be kept in mind. First, Section 101(18) is a helper. Its placement in the Code is intended to aid in defining who qualifies as a 'farmer' under Section 101(17). Secondly, although Section 101(18) may by its terms be regarded as non-exclusive with regards to the types of farming operations which may be included within the definition, it cannot be so broadly applied as to bring in operations clearly outside the nature or practices one normally associates with farming. * * * Section 101(18) suggests that the term 'farming operation' was meant to include those estimates normally done by persons engaged in the initial stages of production."

The North Dakota court cited *Armstrong v. Corn Belt Bank (Matter of Armstrong)*, 55 B.R. 755 (C.D.Ill.1985), as a recent bankruptcy decision which holds that farming operations within the context of 101(18)[20] requires a distinction be made between the nature or character of the income sources to arrive at a determination of what constitutes a "farming operation." In *Armstrong*, the court found income from the sale of farm machinery

and rental of farm land was not derived from a farming operation.[2]

The holding of the district court regarding the farm machinery income was reversed on appeal in *Matter of Armstrong*, 812 F.2d 1024, 1026–27 (7th Cir.1987), where the Court held in discussing 101(18):

"The definition does not provide a simple all-inclusive list of tasks and activities (i.e., tillage of the soil, dairy farming). Instead, the section starts out in general terms—'Farming operation includes *farming*, tillage of the soil, dairy farming ...' (emphasis added). Implicit in this definition is the inclusion of general activities inherent in farming and, we believe, the means (or in this case the equipment) necessary to perpetuate the farming operation the definition speaks of. When a farmer sells some of his machinery in an effort to scale down his operation (say from 200–100 acres) and save the farm, the money received is inescapably from the 50% of the farming operation dissolved.

We believe this to be a pragmatic viewpoint. A contrary result would reap illogical results which we are confident Congress had no desire to create. Farmers in financial trouble could harvest their crop on a given year, decide to scale down their operation, sell machinery and be considered non-farmers under § 101(17) even though they had no significant outside employment or income. Suppose Armstrong had no income from farming rent or the seed company. After all, many legitimate farmers do not rent land or receive wages from outside companies. Given this scenario Armstrong could have made money solely from the sale of beans and corn (and inconsequential income from elsewhere) and yet still have been considered a non-farmer. This result is illogical, undesired and unnecessary. One envisions large numbers of cases where farmers, by merely pruning their operations and selling their equipment, are no longer considered farmers for purposes of the bankruptcy code. We do not believe Congress envisioned such a scenario and believe a broader interpretation is necessary.

Farmers are exempted from the commencement of involuntary cases under Title 11 '... because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors, should not subject him to involuntary bankruptcy.' See Senate Report No. 95–989, U.S.Code Cong. & Admin.News 1978, p. 5787 as found in the Historical & Revision Notes of Title 11. This rationale is steeped in the concept of risk; farmers are caught in a risk-ridden enterprise. To say that the implements which are necessary to perpetuate the enterprise are not part of the enterprise is not logical, especially when, as in the instant case, the implements are sold to keep the enterprise, in its failed form, afloat. We may have reached a different result if the record had revealed that Armstrong had a history of buying and selling equipment on an experimental basis or for investment purposes. However, the record in this case inescapably points to the fact that the sale in this case was, '... a sale of a portion of the equipment of a person in financial trouble.' See Bankruptcy Court Opinion and Order of December 1, 1982, page 4. The record reveals the equipment was a necessity for the farming operation, not a detached investment distinct from the farm. Hence, we conclude it was part of Armstrong's 'farming' within the meaning of the definition of 'farming operation' found at § 101(18)."

In *Dakota Lay'd Eggs*, the court concluded that income from eggs obtained through contracts with independent producers who owned the hens was not farming income, nor is income from trucking a result of any form of planting or husbandry. In the trucking operation, the Debtor Dakota

---

**2.** The district court in *Armstrong* did hold that under the Code a person need not personally till the soil to be a farmer; his income, however, must have some connection with the inherently speculative nature of farm income caused by the ravages of climate and fluctuating farm prices. *Id.* at 760–61.

Lay'd Eggs, rather than deadheading an egg transport truck, back-hauled loads for other people, from which it derived $9,810.00 in income. Clearly, the trucking income in that case did not arise from any ownership or operation by the Debtor of the production of eggs.

The Debtor in this case urges that the trucking of his neighbor's cattle to market is farm related income. Admittedly, and I so find, the trucking of the neighbor's cattle has no connection with Ed Guinnane's over-the-road trucking operation. The Debtor thus contends that trucking of his own cattle and those of his neighbors is a part of an integrated farming operation, and under *Jenkins v. Petitioning Creditor-Friedman*, 664 F.2d 184 (8th Cir.1981), the truck hauling activity for his neighbor was not more than a collateral venture. *Jenkins* is a pre-Code case and is inapposite to the present facts. The facts in this case present a close call on whether the income from trucking neighbor's cattle is part of the Debtors' operations. The deposition testimony of the Debtor Ed Guinnane can be summarized that he hauls 20 to 30 loads from Montana to other states, at 50 head per load at $1.60 a mile one way, in the same trucks he uses to haul his cattle. Debtors own or lease three trucks, and use two in their farm operation. In 1986 the Debtor drove about 130,000 miles in 220 days, which included other help from his family. Guinnane stated he hauls for anyone he can get livestock from, and works through brokers, primarily American Machine Transport out of Seattle. While he is trucking, his wife and son care for the farm, and he works the farm continuously during the irrigation and haying seasons. I conclude from the testimony that the hauling of cattle for third parties is tied directly to the efficiency of the Debtors' farming operation because it aids and constitutes a part of the Debtors' ranching operation. Income is not derived from third party efforts, but from the Debtors' efforts, separate and not related to the same kind of trucking operation of non-

farm products and goods from which the Debtors generated over $122,000.00 in 1986. I hold the Debtors' treatment of a like income expended in 1985 in an income tax return is not determinative of the issue since an accountant's treatment of taxable income is hardly the test to be employed by the court. As a result, after including the trucking income in the $134,909.00 claimed by the Debtors, the Debtors did earn more than 50% of their gross income in 1986 from a farming operation, and thus qualify for Chapter 12 relief. As stated in *Dakota Lay'd Eggs*, supra at 656:

> " * * * the determination must be made by considering the character of the business and whether its income is derived from its own farming or production efforts as opposed to the farming or production efforts of others. * * * Is it a typical farming activity and if so, whose farming activity is it—DCI's (debtor) or someone elses?"

The Debtors have an integrated operation which rests in small part on the efforts of third parties who are engaged in the production of such livestock. That production must certainly include marketing the cattle and because the Debtors in their operation include hauling neighbor's cattle with the Debtors' equipment does not disqualify such source of income as farm income. The trucking activity of the Debtors in this small sense is agri business, not an independent commercial enterprise separate from their farming operation.

IT IS ORDERED that the motion to dismiss this case is denied.[3]

---

**3.** The other portion of the motion concerns sale of mortgage cattle delivered to a Nebraska feedlot because the Debtors ran out of feed and PCA would not advance any further funds of operation. That matter is better addressed in the Chapter 12 Plan.